PULITZER PUB. CO. v. RUMFORD FALLS PAPER CO.

(Circuit Court of Appeals, Eighth Circuit.   February 21, 1903.)

No. 1,705.

1. SALE—CONSTRUCTION OF CONTRACT—WARRANTY.
     A contract to furnish paper for use in the publication of a daily newspaper, to be paid for by weight, which, after specifying the sizes, provided that settlements should be made on the basis of 108 pounds producing 1,000 sheets, "average to be computed on car-load lots," and also that when the paper furnished was overweight it should be paid for on the basis of the weight specified, and when under weight on the basis

of its actual weight, cannot be construed as containing a warranty that each roll of paper should be of the exact weight of 108 pounds to the 1,000 sheets, but recognized the fact that there would necessarily be some variance by providing that the purchaser should have the benefit of such variance, and bound the seller only to act in good faith, and to supply paper which was approximately of the specified weight.

In Error to the Circuit Court of the United States for the Eastern District of Missouri.

This action was brought by the Rumford Falls Paper Company, the defendant in error, against the Pulitzer Publishing Company, the plaintiff in error, to recover a balance of $4,312.36, which was alleged to be due to the paper company from the publishing company for paper supplied to the latter company during the months of September, October, November, and December, 1897. The value of all the paper delivered during that period was $37,269.59, but between November 20, 1897, and February 7, 1898, payments had been made on account, which left a balance due, as the paper company claimed, amounting to the sum above stated, $4,312.36.

The paper in question was supplied under a contract between the paper company and the publishing company of date August 4, 1896, which was as follows:

"St. Louis, August 4, 1896.

"Rumford Falls Paper Co., Rumford Falls, Maine—Gentlemen: We hereby contract with you for the entire supply of paper to be used by the Pulitzer Publishing Co., in this city, for a period of twelve (12) months, beginning January 1st, 1897, and ending December 31st, 1897.

"Paper to be of same quality, sizes and weight as that you are furnishing under our present contract.

"For which we agree to pay you Two Dollars and Twelve Cents ($2.12) per hundred pounds, delivered on board wagons at our press room entrance, free of all other expense to us.

"All other terms and conditions not covered by the above, to be the same that governed our contracts dated Sept. 21st, 1894 and July 31st, 1895.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"[Signed]                                         C. H. Jones,
                      "Editor & Manager St. Louis Post Dispatch.

"Accepted."

The contract of July 31, 1895, to which reference was made in the foregoing contract, was one whereby the paper company agreed to supply the publishing company with the paper necessary for the publication of the St. Louis Post Dispatch for the term of about one year ending December 31, 1896. The only provisions found in that contract which it is deemed necessary to quote in full are the following:

"Paper to be of same quality as that you are now furnishing us, sample herewith attached, and to be of same sizes and weight.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"All white waste taken from the rolls and charged back to you, will be delivered to you or your agent weekly upon demand."

The contract of date September 21, 1894, to which reference is made in the foregoing contract (and which seems to have been the first contract that was entered into by the parties), was a contract whereby the publishing company contracted with the paper company for a full supply of paper to be used by the publishing company in the publication of the St. Louis Post Dispatch for the term of one year beginning not later than October 20, 1894. This initial contract was more elaborate than either of the succeeding contracts. The provisions thereof which are deemed material to the present controversy are the following:

"Paper to be made on rolls in widths of 70¼ in., 53 in., 35⅛ in., 17⅞ in., and in such proportions of each as we may require, and of quality, color, finish, strength, winding and general characteristics, equal to that which shall be accepted by us as satisfactory after one week's continuous run of first

shipments made at your Mill, and to equal the samples you have submitted and which are made a part of this contract.

"For which we agree to pay Two Dollars and Eight Cents ($2.08) per 100 pounds delivered at our press room entrance, free of all other expense.

\* \* \* \* \* \* \* \* \* \* \* \* \*

"Settlements shall be made upon the basis of 108 pounds producing 1,000 (8-page) sheets 35½x43. Average to be computed on full car lots.

"When paper is of standard weight or over, then payment shall be made on basis of production by press of 1,000 8-page sheets computed at 108 pounds to 1,000 sheets.

"When paper is less than standard weight, then payment shall be made upon basis of weight of paper actually printed upon our presses.

"The net weight of paper actually printed upon will be computed by deducting tare and white waste. The Post Dispatch will keep an accurate record of the tare and white waste and production of each roll, and will furnish a statement showing the weight of each roll per 1,000, 8-page sheets, and the production per 108 pounds.

\* \* \* \* \* \* \* \* \* \* \* \* \*

"It is further agreed, that if the paper furnished under this contract, shall not in all respects equal that to be furnished by you, and accepted as aforesaid, then we shall be free to go into the open market and purchase paper of equal quality to that herein provided for, and it is understood that any difference between price so paid and price set forth in this agreement, and any and all other damage caused by your default in any of the stipulations of this contract shall be paid to us by you, so that we shall be saved harmless from any default on your part."

The publishing company, the defendant below, did not deny on the trial that it had received and used the quantity of paper alleged in the complaint during the four months in question. Nor did it claim that it had not received proper credit for all payments made on account, or that the sum unpaid, $4,312.36, was incorrectly stated. Its defense was, and it filed a plea to that effect, that by the contract in suit the paper company "expressly agreed" to furnish paper each 1,000 eight-page sheets whereof should weigh 108 pounds. It averred that the paper supplied during the four months in question was inferior in weight to that agreed to be furnished, and that it was forced to use some paper of inferior weight so supplied during that period. It also averred generally that by the use of such paper of inferior weight it incurred "additional expense in the operation of its presses," that delay was occasioned "in the publication of its successive daily editions," and that it had paid the full worth of the paper. The trial resulted in a verdict in favor of the plaintiff below for the sum demanded.

F. N. Judson (John F. Green, on the brief), for plaintiff in error.

William E. Garvin and Leonard Wilcox (James P. Dawson, on the brief), for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The defense in this case is grounded upon the assumption that the Rumford Falls Paper Company, the plaintiff below, expressly warranted that all the paper to be supplied under its contract with the publishing company should be of such a kind that each 1,000 eight-page sheets at any time produced by the press would weigh 108 pounds; and the first question to be determined is whether this assumption is well founded.

The contract contains no such warranty in terms. It does contain an express agreement that the paper to be supplied shall be "of same

quality, sizes, and weight as that you are furnishing us under our present contract"; but no effort was made by the defendant on the trial to show what was the actual weight or usual run of the paper that was furnished under the contract in force when the last contract was made. Nor does the defendant count upon the last-mentioned provision of the agreement in its answer, or place any reliance thereon, so far as we can ascertain. To sustain its allegation concerning an express warranty, it refers to a provision contained in the first contract with the paper company, of date September 21, 1894, which is as follows: "Settlements shall be made upon the basis of 108 pounds producing 1,000 8-page sheets $35^{1}/_{8}$x43. Average to be computed on full car lots"; and it contends, apparently, that this stipulation bound the plaintiff at its peril to deliver only such paper as would weigh 108 pounds per 1,000 sheets, no more and no less. This provision, however, does not seem to have been inserted in the contract with a view of binding the paper company not to furnish any paper or rolls of paper weighing less than 108 pounds per 1,000 eight-page sheets, since the provision was followed immediately by the further stipulation that, when the paper supplied happened to overrun the last-mentioned weight, it should be paid for at that weight, thus giving the publishing company the benefit of any overweight, and that when it happened to fall below the weight mentioned it should be paid for according to its actual weight. Impliedly, at least, this latter clause bound the defendant to accept and pay for paper which weighed somewhat more or less than 108 pounds per 1,000 sheets. These provisions were inserted, we think, with a view to convenience in making settlements, and not for the purpose of prescribing an absolute standard of weight for each roll, from which there could be no departure without incurring a liability in damages as for a breach of a warranty. The weight of the paper, so far as there was an express agreement on that point, had been specified previously in the clause to which reference has already been made; and while, as above remarked, the defendant made no effort to show what was the weight or quality of the paper that was being supplied when the contract in suit was entered into, yet the plaintiff did offer considerable testimony, which was not controverted, that the quality and weight of its paper improved continuously from 1894 to 1898; that the paper as it was produced was compared constantly with samples that were used when the first contracts were made; and that the paper produced and delivered during the year 1897 was fully up to sample, and as good as the paper which had been delivered to the publishing company previously and by it accepted. The provisions concerning the method of making settlements clearly show that the contracting parties well understood, what the testimony discloses to have been the fact, namely, that the process of manufacturing paper in large quantities for newspaper use, such as that involved in the present instance, could not be so conducted that the paper in each of a large number of rolls would have a perfectly uniform run, being at all places of the same thickness, so as to attain precisely the same weight per 1,000 sheets. The parties to the agreement assumed that the rolls would probably vary somewhat in weight, and they made a very reasonable provision for such a variance, in the manner above

shown, by agreeing that the publishing company should never pay for more than the actual weight of the paper supplied; whereas, if the paper overran at any time the weight named as a basis of settlement, it should not, on that account, be compelled to pay for the surplus weight. It is impossible to read the provisions of the contract in suit relative to the manner of making settlements without being impressed with the conviction that both parties well knew that the paper to be supplied would not run evenly, so as to maintain at all times precisely the same weight. They were doubtless aware that there were difficulties attending the manufacture of paper, which could not be overcome entirely, and, knowing this fact, they prescribed a remedy in the manner of making settlements, which they deemed just, neither party intending to impose on the other an obligation which could not be strictly performed and to hold it accountable in damages for its non-performance.

We are of opinion, therefore, that the defendant below failed to show either an express or an implied warranty, such as was counted upon in its answer, and for the breach of which it sought to recoup damages to the amount of $4,312.36, thereby absorbing the balance due on the plaintiff's account, for paper actually delivered.. It may be conceded that the parties to the agreement assumed that the paper to be supplied would weigh approximately 108 pounds per 1,000 eight-page sheets, and that the paper company would endeavor in good faith to produce paper of about that weight by giving proper attention to the process of manufacture. They realized, however, that, notwithstanding the care which might be exercised, some of the paper produced would, to some extent, exceed or fall below that weight, and they accordingly provided for that contingency by adopting a mode for estimating the weight for the purpose of making settlements that would afford the defendant full protection against losses resulting from the delivery of paper which was heavier than was deemed necessary. The method of making settlements so prescribed by the parties themselves also had the effect, we think, of excluding claims for damages incident to such small and seemingly unimportant variations in the weight of paper as the testimony in this case discloses—the same being variations which do not appear to have been occasioned by any want of good faith, or by any design on the part of the plaintiff company to avoid a full compliance with the terms of its contract. None of the paper that was supplied during the months of September, October, November, and December, 1897, was rejected by the defendant company as unsuitable for its use, but all of it was in fact consumed; and such complaints as were made in the meantime seem to have been made with a view of inducing the paper company to consent to a reduction of the contract price, the value of paper having declined to some extent after the execution of the contract. Moreover, the testimony that was offered at the trial with a view of showing that the publishing company had sustained special damage by the use of some light-weight paper during the months in question was general and unsatisfactory, and we very much doubt whether it would have warranted a jury in finding that any damage had been sustained on that account. It is unnecessary, however, to express a definite opinion on that point,

since we conclude, as heretofore stated, that the defendant did not succeed in establishing such a warranty as it pleaded and relied upon in its answer. For the same reason all the errors specified in the assignment of errors relating to rulings upon testimony and the refusal of instructions become, in our judgment, immaterial, and any discussion thereof is unnecessary.

We are satisfied that the judgment below was for the right party, and it is accordingly affirmed.